Raker et al., Appellants, *v.* G. C. Murphy Company.

Argued January 7, 1948. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

*J. Julius Levy,* with him *James E. O'Brien, Eugene Nogi* and *Nogi, O'Malley & Harris,* for appellants.

*C. H. Welles, 3rd,* with him *Welles, Mackie, Mumford & Law,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, March 22, 1948:

The owner of a property created a mortgage thereon and then leased the store portion to a tenant. He died, and two of his sons, who together with others inherited the reversion, procured an assignment of the mortgage, foreclosed it, and then brought proceedings to evict the lessee. Such an attempt, being contrary to both law and morals, cannot be allowed to succeed, and the court below properly so held.

The property in question is 1838-40 N. Main Avenue, Scranton. The owner, Harry Raker, in 1931 executed a mortgage thereon to the North Scranton Bank and Trust Company in the sum of $30,000, payable one year from the date thereof. Nine years later he gave a written lease to G. C. Murphy Company of the street floor and basement for a term of 21 years, and at the same time entered into an agreement with the Murphy Company

and the Bank whereby the former agreed to expend $10,000 to improve the premises and to pay all rent to the Bank and the Bank agreed that before taking any action to foreclose the mortgage it would offer to assign it to the lessee, and would not foreclose it, assign it to other parties, or dispossess the lessee, as long as the latter complied with all the terms of the lease, these provisions to be effective for a period of ten years. The Murphy Company made the improvements, paid the monthly rentals to the Bank, and performed all its other obligations under the lease.

Harry Raker died intestate in 1944, leaving as his heirs at law his widow Sarah and three adult sons, Lester, Joseph and Milford. At the time of his death he owed the Bank a sum in excess of $90,000, which included the debt secured by the mortgage on the Main Avenue property. After some negotiations the Bank agreed to compromise this indebtedness for $66,000, part of which was to be paid in cash and the balance obtained from the sale of certain securities which the Bank held as collateral; it also agreed (in violation of its covenant in the tripartite agreement) to assign the mortgage to Joseph and Milford Raker. The terms of this settlement, which were embodied in a written contract, were duly carried out by the parties. There is some conflict in the testimony as to when the sons first became aware of the existence of the tripartite agreement entered into by their father but it is clear that a copy of it was handed to their counsel in their presence at least at the time when the assignment of the mortgage was delivered by the Bank; however, this is unimportant in view of other controlling questions in the case.

Promptly upon receipt of the mortgage Joseph and Milford Raker instituted foreclosure proceedings, naming as defendants the Estate of Harry Raker as mortgagor and all the heirs of Harry Raker as terre-tenants and real owners, but they did not make the Murphy

Company a party. Service was promptly accepted on behalf of Sarah and Lester Raker, judgment entered, a writ of levari facias issued, sale held, and a sheriff's deed executed to Joseph and Milford Raker. The latter then notified the Murphy Company that they disaffirmed the lease; the Murphy Company refused to surrender possession, and Joseph and Milford Raker filed a petition under the Act of April 20, 1905, P. L. 239, to obtain possession.

It is obvious that when title to the property descended to Harry Raker's widow and sons they could not have repudiated the lease which Harry Raker had made. In that lease there was a formal covenant of quiet enjoyment, but, even if it had not been expressed, such a covenant would have been implied: *Duff v. Wilson,* 69 Pa. 316; *Lanigan v. Kille,* 97 Pa. 120; *Kelly v. Miller,* 249 Pa. 314, 94 A. 1055; *Einfeld v. Shermer,* 56 Pa. Superior Ct. 4, 11. When Harry Raker died his reversionary estate descended to his heirs who thereby became the Murphy Company's landlord, and, as the covenant of quiet enjoyment ran with the reversion, it was, of course, binding upon them: 32 Am. Jur. 263, §282. Indeed the lease contained a provision that "All rights and liabilities herein given to or imposed upon either of the parties hereto shall extend to the heirs, executors, administrators, successors and assigns of such party."

When Joseph and Milford Raker became the assignees of the mortgage, foreclosed it, and purchased the property at sheriff's sale, the title they acquired was for the benefit not only of themselves but also of Sarah and Lester Raker who had held with them a joint or common interest in the estate. Where several persons have such an interest one of them cannot purchase an encumbrance or an outstanding title and set it up to the exclusion of the others; in such a case the purchase inures to the benefit of all of them: *Weaver v. Wible,* 25 Pa. 270; *Tanney v. Tanney,* 159 Pa. 277, 28 A. 287; *Enyard v. Enyard,* 190 Pa. 114, 42 A. 526; *Stimson v.*

*Stimson,* 346 Pa. 68, 71, 29 A. 2d 679, 681. Therefore the mortgage foreclosure proceedings did not change in any way the ownership of the property.

Since the Raker heirs could not, prior to their acquisition of the mortgage, have disaffirmed the lease and evicted the tenant, they could not accomplish that same result by the transparent device of acquiring the mortgage, foreclosing it, buying in the property, and then claiming that their rights were paramount to those of the lessee because of the original priority of the mortgage over the lease in point of time. That all the proceedings they instituted were designed for the sole purpose of freeing themselves from the Murphy Company lease is so obvious as to preclude the necessity of discussion. Having paid off the mortgage to the Bank there could have been no other reason for their failure to have it cancelled and satisfied of record instead of taking it over by way of assignment and then foreclosing it against themselves. The learned Judge in the court below found as a fact that they "requested and obtained the assignment of the Bank's mortgage and prosecuted the foreclosure proceedings intending to invalidate this lease", and added that "one would have to be quite naive to conclude otherwise." Where a landlord deliberately instigates, procures, assists and expedites the foreclosure of a mortgage on his property, and the purchaser in the foreclosure sale evicts a tenant holding under a lease to which the mortgage was paramount, the lessor becomes liable to the lessee in damages for the full value of the leasehold because of the breach of the covenant for quiet enjoyment: *Einfeld v. Shermer,* 56 Pa. Superior Ct. 4. *A fortiori,* if a landlord, for the purpose of destroying the lease, himself purchases a paramount mortgage, forecloses it, and then, on the claim that he has succeeded to the rights of the mortgagee, seeks to evict the lessee, neither law nor equity will give countenance to such an attempt but will protect the right of the tenant to retain undisturbed possession for the

term of the lease: *American Welding Co. v. William H. Haskell Manufacturing Co.*, 107 A. 213 (R. I.); *Brookhaven Rialto Theatre Corporation v. Feiger*, 52 N. Y. S. 2d 254; *Morris v. Connellan*, 25 D. & C. 459; *Sattler v. Freedman*, 50 D. & C. 132. It is clear that to allow petitioners to succeed in this action would be to render meaningless the covenant of quiet enjoyment and their other obligations under the lease, and it would enable them to profit by exploiting the only danger to the lessee's possession which existed and against which they were bound to protect it by reason of their succession to their father's reversionary interest.

Judgment and decree affirmed; costs to be paid by plaintiffs.